## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NOEL QUINTANA a/k/a CHRISTOPHER
SANDLE,

        *Plaintiff,*

   v.

CITY OF PHILADELPHIA, *et al.*,

        *Defendants.*

CIVIL ACTION
No. 17-0996

**PAPPERT, J.**                                              **July 30, 2018**

## MEMORANDUM

Noel Quintana sued the City of Philadelphia, the Philadelphia Police Department, the Philadelphia District Attorney's Office and eighteen individuals including officers, detectives and assistant district attorneys, after being prosecuted and acquitted of attempted rape and related offenses. Following the Court's July 21, 2017 Memorandum Opinion dismissing a number of parties and claims, some with leave to amend, the Court now considers Defendants' motions to dismiss Quintana's Third Amended Complaint. With this fourth and final iteration of his allegations, Quintana asserts claims for malicious prosecution under 42 U.S.C. § 1983 and Pennsylvania law, conspiracy under § 1983, and negligent and intentional infliction of emotion distress under state law. The Court grants in part and denies in part Defendants' Motions for the reasons that follow.

A

In November of 2010, the Philadelphia Police Department's Special Victims and Homicide units were investigating a string of rapes and murders that occurred in Kensington. (Third Am. Compl. ¶¶ 36, 37, 54, ECF No. 37.) The police believed that one unidentified suspect, dubbed the "Kensington Strangler," had committed these horrific crimes against at least three women. (*Id.* at ¶¶ 37, 54.)

Against this backdrop, on November 28, 2010 at approximately 10:45 p.m., Rachel Patterson was attacked on the 1900 block of Backius Street in Kensington, which was near her home at the time. (*Id.* at ¶¶ 38, 63.) Patterson, a prostitute under the influence of crack cocaine, entered a vacant lot to engage in sexual conduct, whereupon the male she was with forcibly grabbed her and put what she believed to be a knife or box cutter to her neck. (*Id.* at ¶¶ 38, 50–51.) Patterson screamed, after which her attacker attempted to choke her. (*Id.* at ¶ 38.) She fought back and screamed again, causing her attacker to flee. (*Id.*) At 10:47 p.m., Officers John Cole and Timothy Miller responded to a radio call reporting Patterson's assault. (*Id.* at ¶ 39.) Cole and Miller took Patterson's initial report and relayed information about the attacker over police radio. (*Id.*) Her attacker was described as a light-skinned, skinny male, 5'8" to 5'11", about 180 to 200 pounds, in a black hat and gray hoodie. (*Id.* at ¶ 40.)

---

[1] The facts are derived from the Complaint, matters of public record and documents integral to or explicitly relied upon in the Complaint, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and are taken as true and viewed in the light most favorable to Quintana, *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Approximately fifteen minutes later, Quintana was walking on the 2000 block of Wheatsheaf Lane (about a mile away from 1900 Backius) when Officers Jeffrey Schmidt and Sean Matrascez stopped him. (*Id*. at ¶ 41.) Quintana, a 5'5" to 5'6", approximately 154 pound Puerto Rican male, dressed in a gray hoodie, dark jeans and a black and yellow jacket with a closely shaved goatee, provided the officers with his identification and thereafter was permitted to leave. (*Id*. at ¶¶ 42–44, 92.) Later, after further discussion with Patterson, Officers Cole and Miller provided updated information on Patterson's attacker over police radio. (*Id*. at ¶¶ 43–44.) The suspect was further described as wearing dark jeans with a black and yellow jacket and a goatee. (*Id*.)

Patterson was taken to the Special Victims Unit where she met with Detective Michael McGoldrick who took her statement around midnight. (*Id*. at ¶¶ 47–48.) She described her assailant as a 35-year-old, 5'11" Puerto Rican male with light skin, a medium build and a goatee, wearing dark jeans, a gray hoodie and a black and yellow jacket.[2] (*Id*. at ¶ 48.) She said that he never sexually touched her nor tried to remove any of her clothing. (*Id*. at ¶ 49, 52.) She stated that she did not see a knife or a box cutter, but that she felt the blade against her neck. (*Id*. at ¶ 50.) McGoldrick informed Homicide of Patterson's attack, believing the perpetrator to be the Kensington Strangler. (*Id*. at ¶¶ 55, 102.) At no point was Patterson asked by responding or investigating officers whether she was under the influence of any substance. (*Id*. at ¶ 51.)

---

[2]    Quintana twice asserts that Patterson failed to state that her assailant had any tattoos; however, he fails to allege that he in fact had a tattoo. (Third Am. Compl. ¶¶ 45, 53; *but see* Reply to City Defs.' Mot. at 10 (stating that Quintana has a large neck tattoo).)

The next morning at approximately 11:30 a.m., homicide Detective Phillip Nordo,[3] who was working the Kensington Strangler investigation, interviewed Patterson. (*Id*. at ¶ 59.) The pair drove around Kensington so that Patterson could identify the location of her attack. (*Id*. at ¶ 61.) Nordo then showed her various photo arrays using an imaging machine in an attempt to have her identify her attacker. (*Id*. at ¶¶ 59, 64.) When she was unable to do so, Nordo separately showed Patterson Quintana's picture, as Homicide had by now tied Quintana's pedestrian stop to the Kensington Strangler investigation. (*Id*. at ¶¶ 58, 65, 67.) Apparently unable to obtain and show Quintana's picture with the imaging machine, Nordo pulled up Quintana's driver's license picture and Patterson positively identified Quintana as her assailant. (*Id*. at ¶¶ 66, 67.) Detective Crystal Williams contacted McGoldrick at approximately 12:30 p.m. to inform him of the positive identification. (*Id*. at ¶ 71.) Quintana does not allege any additional details about the process used by Detective Nordo, nor whether McGoldrick was provided with any information about the procedure used.

At that point, the police believed Quintana to be the Kensington Strangler and accordingly distributed his information online, including allegedly posting a picture of Quintana as the Kensington Strangler. (*Id*. at ¶¶ 68, 69, 73.) That day, Detective Nordo, with approval from Assistant District Attorney Jennifer Mitrick, prepared an affidavit of probable cause[4] and Quintana was arrested. (*Id*. at ¶¶ 70, 74, 83.) While Quintana was apparently told he was being brought in "solely for questioning," he

---

[3]     Nordo's name is at times incorrectly spelled "Nardo" in Quintana's complaint, including in the case caption.

[4]     Quintana does not attach the affidavit to the Complaint or allege that the affidavit was presented to an issuing authority or that an arrest warrant was obtained prior to his alleged arrest as the Kensington Strangler. (*See* Third Am. Compl. ¶ 70.)

believes he was arrested for the Kensington Strangler murders. (*Id*. at ¶¶ 75, 77.) He was handcuffed, photographed, fingerprinted, strip searched, shown pictures of the Kensington Strangler murder victims and repeatedly questioned about the murders. (*Id*. at ¶¶ 74–76, 78, 96.) Patterson's assault was allegedly never discussed. (*Id*. at ¶ 77.)

Quintana asserts that at some point after being taken into custody as the Kensington Strangler, Defendants "knew that they had arrested the wrong person." (*Id*. at ¶ 79.) He believes he was then arrested for Patterson's assault in an attempt to cover up the false arrest and justify his retention in custody. (*Id*.) Quintana alleges that Detectives Nordo, Williams and James Bamberski[5] provided Patterson with his "description and particulars" and showed her his picture.[6] (*Id*. at ¶ 82.) Patterson then returned to SVU at approximately 3:30 a.m. on November 30 to meet with McGoldrick. (*Id*. at ¶ 84.) He showed her a photo spread that included a photo of Quintana along with seven other pictures. (*Id*., Ex B.) Patterson again positively identified Quintana as her attacker. (*Id*.; Third Am. Compl. ¶ 84.)

McGoldrick drafted an affidavit of probable cause, which Quintana attached as Exhibit B to his pleading. (*See* Third Am. Compl., Ex. B.) The affidavit recounts Patterson's statement, indicates that Officers Schmidt and Matrascez stopped Quintana, a male fitting Patterson's description of her assailant, shortly after the attack and finally states that Patterson positively identified Quintana from a photo array conducted by McGoldrick. (*Id*.) Based on this information, Lieutenant Anthony

---

[5]     Bamberski's name is incorrectly spelled "Bambruskey" and "Bambrusky" throughout the Complaint.

[6]     Quintana further alleges that at some point Nordo physically showed him to Patterson. (*Id*. at ¶ 80.)

Mirabella[7] and Sergeant John Morton approved Quintana's arrest for Patterson's attack and a warrant was obtained at approximately 7:50 p.m., although Quintana was already in custody by then. (*Id*. at ¶¶ 85–87.)

Quintana was arrested and charged under the alias Christopher Sandle. (*See* Third Am. Compl. ¶¶ 1, 83.) He was preliminarily arraigned on December 1, 2010. *See* Docket, *Commonwealth of Pennsylvania v. Christopher Sandle*, No. CP-51-CR-0003448-2011 (Phila. Cty. Ct. of Common Pleas Sept. 30, 2014). The Philadelphia Court of Common Pleas Docket lists nine charges: attempted murder, aggravated assault, attempted rape by forcible compulsion, attempted sexual assault, unlawful restraint/serious bodily injury, possession of instrument of crime, simple assault, recklessly endangering another person and false imprisonment. (*Id*.) The offense date for each offense was November 28, 2010. (*Id*.) Quintana remained incarcerated on a state court detainer until he was acquitted on all charges related to Patterson's assault on September 30, 2014 and he was finally released on October 8, 2014. (Third Am. Compl. ¶¶ 97, 105, 115–16, 137.)

Quintana contends, although his docket does not so reflect, that he was charged with the three Kensington Strangler murders. (*Id*. at ¶¶ 96, 103.) He asserts that the magistrate judge told him that "he was going to be charged with three counts of murder," in addition to other charges. (*Id*. at ¶ 103.) Quintana claims that he was not informed that his charges had been changed from murder to attempted murder until February 23, 2011. (*Id*. at ¶ 110.) At no point in time was Quintana prosecuted for murder. (*Id*. at ¶¶ 99, 104.) Further, at Quintana's formal arraignment on March 24,

---

[7]     Mirabella's name is at times incorrectly spelled "Mirdedla" in the Complaint, including in the case caption.

2011, the attempted murder charge was dismissed for lack of evidence. *See* Docket, *Commonwealth of Pennsylvania v. Christopher Sandle*, No. CP-51-CR-0003448-2011 (Phila. Cty. Ct. of Common Pleas Sept. 30, 2014).

Shortly after Quintana's arrest and arraignment, in January 2011, the Philadelphia Police Department identified through DNA testing Antonio Rodriguez as the Kensington Strangler. (Third Am. Compl. ¶¶ 107, 109.) Rodriguez was arrested, charged and successfully prosecuted for the three murders. (*Id*. at ¶ 107.)

B

Quintana originally filed suit in the Philadelphia Court of Common Pleas alleging various claims, including false arrest, false imprisonment and malicious prosecution. (Notice of Removal, ECF No. 1.) The case was removed to federal court and Defendants filed motions to dismiss. (*Id*.) After Quintana amended his complaint, Defendants again filed motions to dismiss which the Court granted on July 21, 2017. (ECF Nos. 14, 15.) The Court dismissed Quintana's false arrest and false imprisonment claims with prejudice because they were barred by the applicable statute of limitations but granted Quintana leave to amend various claims, including that for malicious prosecution. (ECF Nos. 14, 15.) Quintana accordingly filed a Second Amended Complaint. (ECF No. 22). Quintana then sought and received leave to file a Third Amended Complaint. (ECF Nos. 30, 36.) Prior to filing the Third Amended Complaint, however, Quintana voluntarily withdrew all claims against the Philadelphia District Attorney's Office and its employees. (ECF No. 35.)

Quintana now asserts claims for conspiracy and malicious prosecution against the City of Philadelphia, the Philadelphia Police Department, the Philadelphia District

Attorney's Office and thirteen individual officers and detectives. (ECF No. 37.) Count I attempts to state a malicious prosecution claim under § 1983 and the Fourth Amendment against all defendants; Count II asserts a conspiracy claim under § 1983 and the Fourth Amendment against all defendants; Count III alleges a *Monell* claim against the City of Philadelphia and Police Commissioner Richard Ross; Count VI is for malicious prosecution under Pennsylvania law against all defendants; and finally, Count VII is for negligent and intentional infliction of emotional distress, also under state law, against all defendants.[8] (*Id*.)

Quintana alleges that he was falsely charged and maliciously prosecuted without probable cause for Patterson's attack. (*Id*. at ¶¶ 79, 91, 94.) He contends that he did not meet Patterson's description of her assailant and that the investigating officers "disregarded" differences between him and the person Patterson described. (*Id*. at ¶¶ 92, 93, 136.) He asserts that his arrest and prosecution for Patterson's assault was an attempt to cover up his false arrest as the Kensington Strangler and was motivated by his race. (*Id*. at ¶¶ 91, 134.) Further, he contends that the Defendants ignored "ample evidence" supplied to them by Quintana's defense attorney that exonerated him, but fails to elaborate on any such evidence. (*Id*. at ¶¶ 123–26.) Defendants also allegedly conspired to "impede the true course of justice," to maliciously prosecute Quintana and to present testimony at his preliminary hearing and trial that his physical appearance matched Patterson's description when they knew it did not. (*Id*. at ¶¶ 130–31.)

## II

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

---

[8] The Complaint does not contain a Count IV or V.

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

## III

To the extent Quintana asserts claims against the Philadelphia Police Department, they are dismissed with prejudice. As explained in the Court's July 21, 2017 Memorandum Opinion (ECF No. 14), as a department of the City of Philadelphia, the Philadelphia Police Department "has no separate existence of its own and is not subject to suit." *Baylor v. Phila. Prison Sys.*, No. 10-CV-1468, 2010 WL 3191803, at *1 (E.D. Pa. Aug. 11, 2010); 53 P.S. § 16257. Further, to the extent that Quintana is attempting to reassert claims against the Philadelphia District Attorney's Office, they

too are dismissed with prejudice as on November 28, 2017, he filed a notice of voluntary dismissal, with prejudice, of all claims asserted against the Philadelphia District Attorney's Office.  (ECF No. 35.)

## IV

To prevail on a Fourth Amendment malicious prosecution claim under § 1983, Quintana must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceeding. *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (quotation omitted).[9]

Defendants argue that Quintana's malicious prosecution claims fail because: (1) the Complaint is ambiguous as to which, if any, of the Defendants initiated proceedings against him; (2) there was probable cause to arrest him; and (3) the Defendants are entitled to qualified immunity.  (City Defs.' Mot. at 15–16; Nordo's Mot. at 11–12, 17.)

## A

Malicious prosecution under § 1983 redresses constitutional deprivations that result from the "wrongful institution of legal process"—"when, for example, [the complainant] is bound over by a magistrate or arraigned on charges." *Wallace v. Kato*, 549 U.S. 384, 389–90 (2007) (emphasis omitted); *see also Heck v. Humphrey*, 512 U.S. 477, 484 (1994) ("[U]nlike the related cause of action for false arrest or imprisonment,

---

[9]     A claim for malicious prosecution under Pennsylvania law requires proof of only the first four elements of a federal malicious prosecution claim.  *Kossler v. Crisanti*, 564 F.3d 181, 186 n.2 (3d Cir. 2009); *Kelley v. Gen. Teamsters, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988).  The Defendants do not dispute that Quintana has sufficiently stated a deprivation of liberty.  Therefore, the Court considers Quintana's state and federal malicious prosecution claims together.

[malicious prosecution] permits damages for confinement imposed pursuant to legal process."). "If there is a false arrest claim, [it] cover[s] the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Wallace*, 549 U.S. at 390; *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007). As Quintana's claims for false arrest and false imprisonment are barred by the statute of limitations (*see* July 21, 2017 Mem. Op. at 16–17, ECF No. 14) and his remaining claims focus on his alleged malicious prosecution, the relevant seizure and criminal proceeding for purposes of the Court's analysis began with the warrant for his arrest.

B

Defendants assert that the Complaint is "at best, ambiguous" as to who initiated the criminal proceedings against Quintana and the malicious prosecution claims should therefore be dismissed. (City Defs.' Mot. at 15; Nordo's Mot. at 11.) Further, Nordo contends that he did not influence the initiation of the proceedings. (Nordo's Mot. at 11.) While the Court agrees that Quintana's Complaint is ambiguous in parts, it sufficiently alleges the involvement of various Defendants, including Nordo, in the decision to institute the criminal proceedings against Quintana.

While prosecutors are typically responsible for initiating criminal proceedings, other government actors can be liable for initiating a proceeding by virtue of their involvement in providing information to the prosecutor or the arresting police officers. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.2 (3d Cir. 1998), *as amended* (Dec. 7, 1998) ("Decisions have 'recognized that a § 1983 malicious prosecution claim

11

might be maintained against one who furnished false information to, or concealed material information from, prosecuting authorities.'" (citation omitted)). Police officers may be liable for malicious prosecution if they influenced or participated in the decision to commence criminal proceedings. *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014); *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 379 (E.D. Pa. 2018). However, actions that are "too minor" or "too removed" from the prosecution or the decision to institute proceeding are insufficient. *See Wiltz v. Middlesex Cty. Office of Prosecutor*, 249 F. App'x 944, 950 (3d Cir. 2007). The officer's conduct must be a "significant cause of the prosecution." *Aleynikov v. McSwain*, No. 15-1170, 2016 WL 3398581, at *11 (D.N.J. June 15, 2016), opinion clarified, No. 15-1170 (KM), 2016 WL 5340513 (D.N.J. Sept. 22, 2016) (quoting *Halsey*, 750 F.3d at 297 n.22 ).

McGoldrick prepared an affidavit of probable cause that was later approved by Mirabella and Morton. (Third Am. Compl. ¶ 85–87; *id*., Ex. B.) These actions were clearly instrumental to initiating the criminal proceedings. Further, the warrant application relied on the positive identification of Quintana. (Third Am. Compl. ¶ 85; *id*., Ex. B.) The allegations against the officers alleged to have impermissibly influenced the photo identification are therefore also sufficient. Quintana claims that Detectives Nordo, Bamberski and Williams provided Patterson with Quintana's "description and particulars" in an apparent attempt to influence her identification of Quintana. (Third Am. Compl. ¶ 82.) He further alleges that Nordo conducted an impermissibly suggestive photo identification by showing Patterson Quintana's driver's license photo after she failed to identify her attacker in the photo imager. (*Id*. at ¶¶ 65–67.) If true, the facts alleged show that the detectives' conduct influenced

Patterson's ability to accurately identify her attacker, which ultimately supported Quintana's arrest. *See United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006) ("[I]t is beyond question that [when it comes to establishing probable cause] the police cannot insulate a deliberate falsehood . . . simply by laundering the falsehood through an unwitting affiant who is ignorant of the falsehood."); *Thomas*, 290 F. Supp. 3d at 380 (denying motion to dismiss against officer because he provided pictures to investigating detectives which "influenced" the decision to bring charges).

However, the malicious prosecution claims against all other individual defendants are dismissed with prejudice. Quintana fails to allege that the remaining officers were sufficiently involved in procuring the warrant for his arrest.[10] Quintana's claims against the City of Philadelphia and Commissioner Ross in his official capacity[11] are addressed below in the Court's *Monell* analysis.

## C

Defendants further argue that the malicious prosecution claims should be dismissed because the warrant for Quintana's arrest was supported by probable cause. Probable cause exists if "there is a 'fair probability' that the person committed the crime

---

[10] Commander Richard Ross, Officer Samuel Hudson and Detective Thomas Martinka are mentioned only in cursory fashion in the Complaint; they are not alleged to have had any actual involvement in Quintana's arrest. (*See* Third Am. Compl.) Schmidt and Matrascez are alleged only to have conducted the pedestrian stop of Quintana. (*See id.* at ¶¶ 41, 42, 43, 46.) Cole and Miller are alleged to have responded to the initial radio call of Patterson's attack, conveyed the initial descriptions of Patterson's assailant over police radio and to have physically arrested Quintana. (*See id.* at ¶¶ 39, 44, 83.) This conduct is both "too minor" and "too removed" from the prosecution to withstand Defendants' Motion to Dismiss.

[11] "Official capacity suits . . . are just another way of pleading an action against an entity of which an officer is an agent." *Helm v. Palo*, No. 14-6528, 2015 WL 437661, at *9 (E.D. Pa. Feb. 3, 2015); *see also Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, at 690 n.55 (1978). Therefore, if "the governmental entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 640 (E.D. Pa. 2018) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).

at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000).  In other words, "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested[,]" the officer has probable cause to arrest. *Id*. (quotation omitted)

To prevail on a malicious prosecution claim where the plaintiff was held pursuant to a warrant, the plaintiff must show that the officers "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant." *Andrews*, 853 F.3d at 697 (quotations omitted); *Wilson*, 212 F.3d at 786–87 (quotations omitted).  In particular, an officer may be liable if he "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Thomas*, 290 F. Supp. 3d at 379 (quoting *Finnemen v. SEPTA*, 267 F. Supp. 3d 639, 644 (E.D. Pa. 2017)).  The probable cause analysis "is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) ("Typically, the existence of probable cause in a section 1983 action is a question of fact.")).

Defendants assert that Quintana's arrest was supported by probable cause, relying primarily on Patterson's positive identification of Quintana.  However, "courts have consistently considered the context of an identification, and have not stated that

police can rely on any witness accusation, however unreliable or unbelievable." *Wilson*, 212 F.3d at 791. The Third Circuit Court of Appeals, "stressing that probable cause requires an individualized analysis," stated that "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." *Andrews*, 853 F.3d at 701; *see Wilson*, 212 F.3d at 790.

Further, a witness's identification can be rendered unreliable by unnecessarily suggestive identification procedures. *See Perry v. New Hampshire*, 565 U.S. 228, 235 (2012); *Newsome v. City of Newark*, 279 F. Supp. 3d 515, 530 (D.N.J. 2017). When assessing whether such procedures "so tainted the resulting identification as to render it unreliable," courts weigh the "indicators of a witness's ability to make an accurate identification" against the "corrupting effect of law enforcement suggestion." *Perry*, 565 U.S. at 239. Ultimately, the operative question in the probable cause context "is whether a reasonable officer would have relied on the identification [ ] to support probable cause" under the circumstances. *Newsome*, 279 F. Supp. 3d at 530; *see also Stansbury v. Wertman*, 721 F.3d 84, 91 (2d Cir. 2013) ("For the purposes of determining whether an identification can support probable cause, the basic question is whether the identification procedure was 'so defective that probable cause could not reasonably be based upon it.'").

Taking Quintana's allegations as true, he has satisfactorily asserted that material facts that call Patterson's reliability as a witness and the reliability of her identification into question were omitted from or misstated in the affidavit of probable cause. Quintana alleges that Patterson was under the influence of crack cocaine at the

time of her assault and could not remember the location of the attack the next morning even though it occurred near her home. Further, the affidavit states that Quintana "fit" Patterson's description of her attacker, without providing any descriptive details. Quintana contends, however, that he did not and that Patterson added, amended and omitted identifying characteristics from the description of her attacker until it began to more closely resemble Quintana. Finally, Quintana contends that the photo identification described in the affidavit of probable cause was tainted by an impermissibly suggestive prior identification and other corrupting influences. All of the above mentioned information was omitted from the affidavit of probable cause and, if true, would be relevant to the probable cause assessment.

D

Defendants argue that the § 1983 claim should nevertheless be dismissed because they are entitled to qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Andrews v. Sculli*, 853 F.3d 690 (3d Cir. 2017) (quotation omitted). Qualified immunity requires a two-step inquiry. First, the Court must determine if the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right. *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Wagner v. N. Berks Reg'l Police Dep't*, No. 5:17-CV-3786, 2018 WL 3361070, at *5 (E.D. Pa. July 10, 2018). "If, however, the facts read in the light most favorable to the plaintiff show a violation of a constitutional right . . . [the Court] must

16

ask 'whether the right was clearly established . . . in light of the specific context of the case.'" *Reedy*, 615 F.3d at 224 (quoting *Saucier*, 533 U.S. at 202). The defendant has the burden of establishing qualified immunity. *Id*. at 223.

A right is clearly established if "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. (quoting *Saucier*, 533 U.S. at 202); *Wagner*, 2018 WL 3361070, at *5. In other words, "'existing precedent must have placed the statutory or constitutional question beyond debate,'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation omitted), such that a police officer would be on notice that his conduct violated the law. *See Bayer v. Monroe Cty. Children & Youth Servs.*, 577 F.3d 186, 193 (3d Cir. 2009); *Wagner*, 2018 WL 3361070, at *5. There need not be a controlling case directly on point; however, the Supreme Court has explained that clearly established law requires "cases of controlling authority . . . at the time of the incident which clearly established the rule on which they seek to rely . . . [or] a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617, (1999); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (stating that general statements of the law can provide clearly established law in obvious cases); *Wagner*, 2018 WL 3361070, at *5.

The Third Circuit has held in general terms that the right to be free from prosecution on criminal charges that lack probable cause is known and clearly established. *See Andrews*, 853 F.3d at 705 (citing *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)); *see also Goldey v. Com. of Pa.*, No. CIV. A. 92-6932, 1994 WL 396471, at *3 (E.D. Pa. June 20, 1994) (concluding that the right to be free from malicious prosecution was clearly established in the Third Circuit). "Furthermore, where an

'officer submits an affidavit containing statements he knows to be false,' he is not entitled to qualified immunity." *Dempsey v. Bucknell Univ.*, No. 4:11-CV-1679, 2012 WL 1569826, at *7 (M.D. Pa. May 3, 2012) (quoting *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993)).

Defendants have not cited, nor has the Court found, any authority suggesting that an impermissibly suggestive photo identification by an arguably unreliable witness provides officers with probable cause. In fact, the cases Defendants rely on address the much more common occurrence of an eyewitness's description of the suspect's height and weight not aligning with the characteristics of the individual the witness ultimately identifies. The facts alleged by Quintana rise far above "an attempt to 'make a constitutional issue' out of a four inch height differential." (City Defs.' Mot. at 19; Nordo's Mot. at 14.) At the motion to dismiss stage, "'the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.'" *Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). The Court cannot yet determine whether Quintana's claim is barred by qualified immunity.

## V

### A

Quintana's *Monell* claim is dismissed with prejudice. Municipal liability under § 1983 cannot be based on *respondeat superior*; rather, it "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691–95 (1978)). Therefore, to state a claim for municipal liability,

"a plaintiff must establish that: (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom." *Simpson v. Ferry*, 202 F. Supp. 3d 444, 452 (E.D. Pa. 2016) (citing *Monell*, 436 U.S. at 692–94). Quintana has not plead facts sufficient to show a policy or custom attributable to the municipality or that any policy or custom caused the alleged constitutional violation. Quintana has now had four chances to get it right and his inability to do so leads the Court to conclude that a further opportunity to amend would be futile.

## B

Quintana's § 1983 conspiracy claim is also dismissed with prejudice. "[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (citation omitted). "[A] bare assertion of conspiracy will not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). While Quintana alleges that the Defendants conspired to maliciously prosecute him in an effort to cover up his alleged false arrest, Quintana has not alleged sufficient facts from which the Court can infer a "combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." *Cash v. Wetzel*, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014). Conspiracy claims "must be based on more than merely suspicion and speculation." *Id*. (citing *Young v. Kann*, 926 F.2d 1396, 1405 (3d Cir. 1991)).

C

Quintana also asserts state law tort claims for negligent and intentional infliction of emotional distress. To recover for negligent infliction of emotional distress, a plaintiff must prove the elements of a negligence claim and "at least one of the following four elements: (1) that the defendant had a contractual or fiduciary duty toward him; (2) that Plaintiff suffered a physical impact; (3) that Plaintiff was in a 'zone of danger' and at risk of an immediate physical injury; or (4) that Plaintiff had a contemporaneous perception of tortious injury to a close relative." *Wilder v. United States*, 230 F. Supp. 2d 648, 653–54 (E.D. Pa. 2002) (citing *Doe v. Phila. Cmty. Health Alts.*, 745 A.2d 25, 27 (Pa. Super. Ct. 2000)). To state a claim for intentional infliction of emotion distress, a plaintiff must allege that: (1) defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) it caused emotional distress, and (4) the emotional distress was severe. *Frankel v. Warwick Hotel*, 881 F. Supp. 183, 187 (E.D. Pa. 1995) (citation omitted).

Quintana's claims for intentional and negligent infliction of emotional distress are barred by Pennsylvania's two-year statute of limitations. *Altieri v. Concordville Motor Car, Inc.*, No. 17-4447, 2018 WL 878368, at *3 (E.D. Pa. Feb. 14, 2018) (citing 42 Pa. Con. Stat. § 5524(7); *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 80 (3d Cir. 1989)). "Under Pennsylvania law, a cause of action accrues, and the statute of limitations begins to run, when a plaintiff is aware, or should be aware, of the existence and source of the claimed injury." *Id.* (citing *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)); *Haagensen v. Pa. State Police*, No. 08-727, 2009 WL 1437608, at *6 (W.D. Pa. May 21, 2009) ("[T]he statute of limitations begins to run as

soon as the right to institute and maintain a suit arises. Generally speaking, in a suit to recover damages for personal injuries, this right arises when the injury is inflicted." (quoting *Fine v. Checchio*, 870 A.2d 850, 857 (Pa. 2005))); *Ormsby v. Luzerne Cty. Dep't of Pub. Welfare Office of Human Servs.*, 149 F. App'x 60, 62 (3d Cir. 2005) ("A cause of action accrues when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action." (citing *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir.1998))).

With respect to claims for intentional and negligent infliction of emotional distress, the statute of limitations begins to run from the date of the defendant's alleged negligent or extreme and outrageous conduct. *See Napier v. City of New Castle*, No. CIV A 06-1368, 2007 WL 1965296, at *7 (W.D. Pa. July 3, 2007); *Robinson v. Cty. of Allegheny*, No. 9-1066, 2009 WL 3853803, at *5 (W.D. Pa. Nov. 17, 2009), *aff'd*, 404 F. App'x 670 (3d Cir. 2010) ("The statute of limitations for intentional infliction of emotional distress in Pennsylvania is two years from the date of the last conduct."); *Rosario v. Lynch*, No. 2:13-CV-01945, 2017 WL 4098709, at *8 (E.D. Pa. Sept. 15, 2017) ("The general rule is that the statute begins to run from the time the negligent act is done." (quoting *Moore v. McComsey*, 459 A.2d 841, 844 (Pa. Super. Ct. May 6, 1983))).

Quintana initialed this case on September 29, 2016 by filing a Writ of Summons in the Philadelphia Court of Common Pleas. (Notice of Removal, ECF No. 1.) *Schutz v. Honick*, No. 2:10-CV-832, 2012 WL 393501, at *3 (W.D. Pa. Feb. 6, 2012) ("[U]nder Pennsylvania law once the writ of summons is timely served the statute of limitations is satisfied[.]"); *see Heater v. Kispeace*, No. 05-4545, 2005 WL 2456008, at *4 (E.D. Pa. 2005) ("For those actions initiated by filing a praecipe for a writ of summons and timely

served within the statute of limitations, the Pennsylvania Supreme Court has held that there is no time limit within which the plaintiff must file the complaint." (citing *Galbraith v. Gahagen*, 204 A.2d 251, 252 (Pa. 1964))). Therefore, the relevant date for purposes of the statute of limitations is September 29, 2014. Claims based on the Defendants' alleged conduct at the time of arrest in 2010 are clearly barred. However, even construing Quintana's claims to extend to the Defendants' purported conduct at his criminal trial, his claims are barred. Quintana's trial began on September 24, 2014 and the prosecution rested its case on September 26, 2014. *See* Docket, *Commonwealth of Pennsylvania v. Christopher Sandle*, No. CP-51-CR-0003448-2011 (Philadelphia Cty. Ct. of Common Pleas Sept. 30, 2014). Therefore, the Defendants' testimony occurred prior to September 29, 2014 and Quintana has failed to allege any relevant conduct by Defendants within the limitations period that would support either claim.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.